IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GAVIN MACKENZIE and MARK BURNETT individually and on behalf of those similarly situated, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:10-CV-2043-P |
| AIR LINE PILOTS ASSOCIATION INTERNATIONAL, ALLIED PILOTS ASSOCIATION, AMERICAN AIRLINES, INC., and AMERICAN EAGLE AIRLINES, INC., | § § § § § § § | |
| Defendants. | § | |

## **MEMORANDUM OPINION AND ORDER**

Now before the Court is Defendants American Airlines, Inc., American Eagle Airlines, Inc., and Air Line Pilots Association International's motion to dismiss. (Docket #55.) After careful consideration of the Parties' briefing and the applicable law, the Court hereby GRANTS the motion.

**A.      The Parties.**

Defendant American Eagle Airlines, Inc. ("Eagle" or "AE") is a subsidiary of Defendant American Airlines, Inc. ("American" or "AA"). Defendant Air Line Pilots Association ("ALPA") is the collective bargaining agent for the Eagle pilots. Defendant Allied Pilots Association ("APA") is the collective bargaining agent for the American pilots.[1]

Plaintiffs Gavin MacKenzie and Mark Burnett ("Plaintiffs") are Eagle pilots who were and

---

[1] For purposes of this order, the movant defendants will be referred to collectively as "Defendants." Defendant Allied Pilots Association filed an answer in this case. (Docket #48.)

1

are eligible to transfer to American pursuant to the Flow-Through Agreement. Under Arbitrator Nicolau's ("Nicolau") remedy decision, Plaintiffs must make an irrevocable decision whether to accept a transfer to American according to a specified time line. (Docket #1 ¶ 20.) Plaintiffs seek to represent a class of 244 individuals, all of whom are Eagle pilots who must make the same election.

**B.     The Flow-Through Agreement.**

In 1997, ALPA, APA, Eagle, and American negotiated a four-party collective bargaining agreement known as the Flow-Through Agreement. The Flow-Through Agreement allowed Eagle pilots to "flow-up" to American when American was hiring new pilots. It also allowed American pilots to "flow-down" to Eagle during pilot furloughs at American. The Flow-Through Agreement states that at least one of every two "new hire" positions per "new hire" class at American will be offered to Eagle captains in order of seniority. (Docket #1 ¶11.)

**C.     Events of 2001.**

In 2001, American acquired the assets of Trans World Airlines ("TWA") in bankruptcy. TWA had filed for bankruptcy in January of that year. In February, TWA, LLC was established to operate the debtor airline under a separate air carrier operating certificate. In April, American purchased the assets of TWA. In November 2001, the former TWA pilots were placed on the AA seniority list.

A dispute arose among the Parties about whether the TWA LLC pilots who had never flown at American, should be considered "new hires" for purposes of the Flow-Through Agreement.

**D.     The Underlying Arbitrations.**

Unable to resolve the dispute among themselves, ALPA filed a grievance that was assigned to arbitration before Arbitrator John LaRocco ("LaRocco"). LaRocco held the former TWA pilots should be treated as "new hires" under the Flow-Through Agreement.

In May 2008, the Parties submitted another issue to arbitration with Arbitrator George Nicolau ("Nicolau"). This dispute was about whether Eagle pilots with AA seniority numbers were entitled to attend training classes at American beginning in June 2007, when American began to recall former-TWA-"new hire" pilots.

Nicolau held a hearing in June 2009 and issued a liability decision in October 2009. Nicolau concluded that, in light of the LaRocco decision that characterized the TWA pilots as "new hires", the Flow-Through Agreement entitled Eagle pilots with AA seniority numbers to one of every two AA training class slots beginning in June 2007. He noted there had been twenty training classes at American between June 6, 2007 and March 18, 2009. Those classes had been attended by 244 TWA "new hire" pilots and no Eagle pilots.

After the Parties tried unsuccessfully to agree on a remedy, Nicolau conducted a hearing. On April 9, 2010, he issued a remedy order, which requires American to offer the 286 most senior Eagle captains holding AA seniority numbers the opportunity to flow-up to American according to a prescribed timetable.[2] Once elections are made, the opportunity to transfer to American shall be offered to the 244 most senior Eagle captains who elect the advancement. The first 35 Eagle captains who choose to flow-up to American shall be placed in training classes beginning no later than June 2010. Following that transfer, American must recall its furloughed American pilots based

---

[2] In other words, the choice to flow-up to American was given to 286 Eagle captains. This was the number of active Eagle captains who held seniority numbers above the least senior active TWA "new hire" pilot.

on seniority until the most junior American pilot furloughed has been offered recall. Following the offer and recall, the remaining Eagle pilots with AA seniority numbers who elected to transfer and those American pilots presently on furlough shall be entitled to enter and re-enter active service at American in seniority order. Of those Eagle captains who transfer, those who are in the 244 shall be entitled to receive compensation and benefits as of the day they would have transferred had they been in one of the June 6, 2007 - March 18, 2009 training classes. (Docket #57-3 at 43-44.)

### E. Plaintiffs' Complaint.

Plaintiffs seek vacatur of Nicolau's remedy opinion under the Railway Labor Act, arguing Nicolau lacked jurisdiction to construct a new agreement that mandated an irrevocable election to flow-up. Plaintiffs contend Nicolau's decision conflicts with an earlier arbitration ruling by Arbitrator Richard Bloch, who determined Eagle captains retained their right to flow-up after expiration of the Flow-Through Agreement. (Docket #60-5.)[3]

### F. Basis for Dismissal.

Defendants move under Rule 12(b)(6) to dismiss Plaintiffs' Complaint because Plaintiffs have not satisfied the RLA's narrow standard for vacating an arbitration award. (Docket #56 at 9 (quoting *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978), which held the scope of judicial review of an arbitration award under the RLA is "among the narrowest known to the law.").)

Plaintiffs respond by arguing that Nicolau exceeded the jurisdiction given to him by the Flow-Through Agreement by forcing Eagle pilots with AA seniority numbers to make an irrevocable

---

[3] In June 2008, Arbitrator Richard Bloch held in a related arbitration dispute "[t]he effect of the expiration of Supp. W [Flow-Through Agreement] in May 2008 on Eagle pilots' employment opportunities is as follows: The right to flow-up is to be retained by Eagle CJ Captains who, prior to May 1, 2008, completed IOE and received AA seniority numbers." (Docket #60-5 Ex. C.)

4

decision to transfer to American or lose the right to flow-up. (Docket # 20-1 at 13.) They argue this take-it-or-leave-it remedy stripped them of their legal right to flow-up. Plaintiffs contend this legal right was given to them by Arbitrator Bloch. Plaintiffs essentially contend Bloch's ruling vested 520 Eagle CJ Captains with an interminable right to flow-up. They argue Nicolau exceeded his jurisdiction by putting limitations on Plaintiffs' exercise of that right and by limiting the choice to flow-up to only 286 Eagle captains (the number of active Eagle captains who held seniority numbers at American that were above the lease senior active former TWA new hire pilot.) (Docket # 20-1 at 10, 12-13.)[4]

The RLA was enacted to promote stability in labor-management relations in the "important national" railroad industry. *Sheehan*, 439 U.S. at 94. Long ago, Congress extended the RLA to air carriers. 45 U.S.C. § 181. The RLA provides for the creation of an Adjustment Board, which is charged with resolving "minor disputes" arising out of the interpretation of collective bargaining agreements. *Sheehan*, 439 U.S. at 94. "Congress considered it essential to keep these so-called 'minor disputes' within the Adjustment Board and out of the courts." *Id.* "The effectiveness of the Adjustment Board in fulfilling its task depends on the finality of its determinations." *Id.*

Accordingly, 45 U.S.C. § 153 First (q) allows for judicial review of arbitration awards in very limited circumstances, one of which is when the arbitration board fails to conform, or confine itself,

---

[4] Plaintiffs also question the merits of Nicolau's decision – specifically, his ruling on downstream damages, his award of compensation and benefits, and his award of preferential hiring rights. (Docket #60-1 at 11.) Because these arguments challenge Nicolau's resolution of the merits of the case, not the jurisdictional basis for his ruling, the Court may not second-guess or disturb those findings. If an arbitrator has not exceeded his authority, "the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001).

to matters within the scope of its jurisdiction. *Sheehan*, 439 U.S. at 93.[5] A court must affirm an arbitral award if the arbitrator is "arguably construing or applying the contract and acting within the scope of his authority." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). If the arbitrator has not exceeded his authority, "the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001). The Fifth Circuit has made clear that a district court's review of an arbitrator's decision is "extremely deferential." *Nat'l Gypsum Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 147 F.3d 399, 401 (5th Cir.1998). When reviewing an arbitration award, a district court is particularly constrained. "As long as the arbitrator's decision 'draws its essence from the collective bargaining agreement' and the arbitrator is not fashioning 'his own brand of industrial justice,' the award cannot be set aside." *Weber Aircraft Inc. v. General Warehousemen and Helpers Union Local 767*, 253 F.3d 821, 824 (5th Cir. 2001); *see Teamsters Local No. 5. v. Formosa Plastics Corp.*, 363 F.3d 368, 371 (5th Cir. 2004).

Nicolau was required to issue a remedy for those Eagle pilots who should have been, but were not, included in the AA training classes. Nicolau heard testimony from several Eagle pilot representatives. (Docket # 57-3 at 35.) He recognized the remedy issues involved were complex and inter-related. (Docket #57-3 at 38.) He carefully considered the purpose, language, and circumstances surrounding the Flow-Through Agreement as he crafted his remedy. Nicolau ultimately concluded that 286 Eagle pilots with AA seniority numbers should be entitled to make a choice about whether they want to flow-up to American. He further concluded, in light of the

---

[5] Courts have applied these restrictions on judicial review to the airline context, despite language in the RLA that says airlines are not subject to the provisions of § 153. 45 U.S.C. § 181.

expiration of the Flow-Through Agreement and in the interest of achieving finality in this litigation, the pilots' choices will be irrevocable. (Docket #57-3 at 41.)

Bloch's decision addressed whether certain Eagle Captains' retained their rights to flow-up to American after expiration of the Flow-Through Agreement in 2008. Bloch held that those Eagle CJ captains with AA seniority numbers who have completed IOE training did retain the right to flow-up after the Flow-Through Agreement expired. Nothing in Bloch's the ruling prevents another arbitrator from placing limits on that right. Bloch did not address the timing of the pilots' decisions to exercise their flow-up rights or the irrevocability of the decisions.

Nicolau addressed those particular issues in his decision implementing a remedy for the pilots who were entitled , but were not permitted, to attend past training classes. In his ruling, Nicolau placed a time limit on the pilots' election to flow up and made the decision irrevocable. He did not take away any rights the Eagle pilots had under Bloch's decision.

Of necessity, the Nicolau remedy had to be implemented going forward. Nicolau recognized that pilots had made their decisions about flowing up several years prior – some as many as ten years prior. He opted to give those pilots another opportunity to make an election so they could consider the changed circumstances since their previous elections. Because the Flow-Through Agreement had expired and in the interest of finality for everyone, Nicolau decided to impose a time limit for the elections to be made and made those elections irrevocable.

Nicolau had broad discretion to interpret and apply Bloch's award as well as to provide an equitable remedy for the violation at issue in the grievance before him. When coming to his decision on this issue, Nicolau considered the facts that the Flow-Though Agreement had expired and that finality was in everyone's interest. His decision drew its essence from the collective bargaining

agreement and Nicolau acted within his authority to place this limitation on the Eagle pilots' rights.

Plaintiffs also argue that Nicolau's remedy award was not confined to remedying the issue of whether Eagle pilots were entitled to attend AA training classes beginning in June 2007. (Docket #60-1 at 3.) They contend generally that his "nuanced, multi-facted" award violated the RLA and the Flow-Through Agreement because it was not confined "strictly to decisions as to the questions so specifically submitted to [him]." (Docket #60-1 at 3, 4.)

A careful reading of Nicolau's remedy opinion leads the Court to conclude that Nicolau acted within the scope of his jurisdiction by establishing a compensation plan for the 244 Eagle captains who were entitled to training class slots beginning in June 2007. Plaintiffs' question "regarding the rights of the remaining 234 pilots of the 520 pilots who held American Airlines pilot seniority numbers" was not before Arbitrator Nicolau and was beyond the scope of his jurisdiction. (Docket # 60-1 at 10.)

Nicolau issued a thoughtful, thorough, and detailed remedy opinion that evinced his consideration of all Parties' concerns and demonstrated his efforts to accurately identify the issues and resolve the Parties' disputes. "Arbitration law wisely relies upon the experience, perspective, understanding of industrial practice, and knowledge of logistics and economics, of the officer chosen as arbitrator." *Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.,* 455 F.3d 313, 1316 (11th Cir. 2006).

Nicolau was asked to formulate a remedy for those Eagle pilots who had been deprived the opportunity to attend AA training classes. His opinion took into consideration the Parties' competing interests, their history and agreements, and other related arbitration rulings. The Nicolau remedy is not irrational and in no way attempts to fashion some new "brand of industrial justice."

His final remedy undoubtedly drew its essence from the collective bargaining agreement. Thus, the Court GRANTS Defendants' motion to dismiss and rejects APA's argument that Nicolau exceeded his jurisdiction in deciding the issue(s) before him.

SO ORDERED, this ___31st___ day of October 2011.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE